```
            IN THE UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF SOUTH CAROLINA
                     CHARLESTON DIVISION

United States of America  )    2:16-cv-1415-PMD
ex rel. Valerie Paquette  )
and Valerie Paquette      )
Individually,             )
                          )
       Plaintiff,         )    FALSE CLAIMS ACT, AND INDIVIDUAL
                          )        CLAIM UNDER 31 U.S.C. §
                          )        3730(h)
                          )
    v.                    )    FILED IN CAMERA and UNDER SEAL
                          )    PURSUANT TO 31 U.S.C. § 3730(b)(2)
Charleston County School  )         (EXEMPT FROM ECF)
District,                 )         JURY TRIAL DEMANDED
                          )
       Defendant.         )
                          )
```

## I.  INTRODUCTION

1. Plaintiff-Relator Valerie Paquette ("Paquette") brings this Complaint on behalf of the United States of America and herself pursuant to the federal False Claims Act, 31 U.S.C. §§ 3729 et seq. (2000) against Defendant Charleston County School District (the "District"). The basis of the Relator's and Paquette's own claims is to recover damages and civil penalties arising from Defendant's wrongful conduct in a false claims scheme that has defrauded the United States Government of substantial federally funded monies by misrepresenting students' progress and attendance in the District. This in turn had the effect of causing the District to be eligible for money and other benefits to which they were not entitled under federal law, including the No Child Left Behind Act and other federal educational programs.

## II.  UNDERLYING POLICIES AND GOALS OF PUBLIC SCHOOLS

2. This case involves the false and misleading reporting of certain grading and attendance policies of the District in the 2013-14 school year and continuing today. The Plaintiff contends that grades and school attendance of students in the Charleston County School District have been reported falsely, or not

reported until after grades and attendance records have been artificially raised through various means by administrators and teachers in the District.

3.   An informed and educated citizenry is a cornerstone of democracy. It is critical that the public be confident that graduates of South Carolina public schools meet valid and objective criteria lest public trust in the school system be eroded. Moreover, the policy of the United States Government is that under-performing students, often those who are minorities, not be passed along without fair effort being made to give them the education they deserve. The goal of federal law is that all children have a fair, equal, and significant opportunity to obtain a high-quality education and reach including, at the least, proficiency on challenging State academic achievement standards and also State academic assessments. 20 U.S.C. § 6301. This was the underlying policy of the No Child Left Behind Act, 20 U.S.C. §§ 6301 et seq. (2000), which was controlling law when most of the acts and omissions set forth below occurred. These same public policies continue today under successor legislation to No Child Left Behind.

4.   As shown by 20 U.S.C. § 6301(1)-(12), Congress believes these goals can best be achieved by:

> (1) ensuring that high-quality academic assessments, accountability systems, teacher preparation and training, curriculum, and instructional materials are aligned with challenging State academic standards so that students, teachers, parents, and administrators can measure progress against common expectations for student academic achievement;
> (2) meeting the educational needs of low-achieving children in our Nation's highest-poverty schools, limited English proficient children, migratory children, children with disabilities, Indian children, neglected or delinquent children, and young children in need of reading assistance;
> (3) closing the achievement gap between high- and low-performing children, especially the achievement gaps between minority and non-minority students, and between disadvantaged children and their more advantaged peers;
> (4) holding schools, local educational agencies, and States accountable for improving the academic achievement of all students, and identifying and turning around low-performing schools that have failed

to provide a high-quality education to their students, while providing alternatives to students in such schools to enable the students to receive a high-quality education;
(5) distributing and targeting resources sufficiently to make a difference to local educational agencies and schools where needs are greatest;
(6) improving and strengthening accountability, teaching, and learning by using State assessment systems designed to ensure that students are meeting challenging State academic achievement and content standards and increasing achievement overall, but especially for the disadvantaged;
(7) providing greater decision-making authority and flexibility to schools and teachers in exchange for greater responsibility for student performance;
(8) providing children an enriched and accelerated educational program, including the use of schoolwide programs or additional services that increase the amount and quality of instructional time;
(9) promoting schoolwide reform and ensuring the access of children to effective, scientifically based instructional strategies and challenging academic content;
(10) significantly elevating the quality of instruction by providing staff in participating schools with substantial opportunities for professional development;
(11) coordinating services under all parts of this subchapter with each other, with other educational services, and, to the extent feasible, with other agencies providing services to youth, children, and families; and
(12) affording parents substantial and meaningful opportunities to participate in the education of their children.

### III. **JURISDICTION AND VENUE**

5.   This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question) and 31 U.S.C. § 3732 (False Claims Act jurisdiction).

Venue is proper pursuant to 31 U.S.C. § 3732(a) which provides that "[a]ny action under section 3730 may be brought in any judicial district in which the defendant or, in the case of multiple defendants, any one defendant can be found, resides, transacts business, or in which any act proscribed by section 3729 occurred."

6.   The Charleston County School District is a school district located in Charleston County, South Carolina. Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) because Defendant Charleston County School District transacts business primarily or solely in the Charleston Division, and numerous acts proscribed by 31 U.S.C. § 3729 occurred in this District.

7.   Ms. Paquette's claims and this Complaint are not based upon prior public disclosures of allegations or transactions in a federal criminal, civil, or administrative hearing in which the Government or its agent is a party; in a congressional, Government Accountability Office, or other federal report, hearing, audit, or investigation; or from the news media, as enumerated in 31 U.S.C. § 3730(e)(4)(A). To the extent that there has been a public disclosure unknown to Plaintiff-Relator, she is the "original source," and the public disclosure is a result of Plaintiff-Relator voluntarily providing this information to the United States prior to filing this *qui tam* action. 31 U.S.C. § 3730(e)(4)(B).

## IV. ACCOUNTABILITY, PARTIES, AND IMPORTANT SCHOOL OFFICIALS

**Accountability Issues**

8.   In 2002, the United States Government made certain educational grants available to the States pursuant to 20 U.S.C. § 6311 (2000). However, for any State desiring to receive such a grant, its State educational agency was required to submit to the United States Secretary of Education ("Secretary") a plan in consultation with local educational agencies, teachers, principals, pupil services personnel, administrators (including certain administrators), other staff, and parents. The plan was required to satisfy the requirements of § 6311 and be coordinated with other programs under the chapter. See 20 U.S.C. § 6311(a)(1). Challenging academic standards were required, which

had to be the same academic standards that applies to all schools and children in the State. South Carolina, upon information and belief, received federal grants under this section. Certain school districts, including the Charleston County School District, received federal funds, but did not comply with rules and regulations required by Congress.

9.   Central to achieving Congress' goals for its educational grants is accountability.[1] *See, e.g.*, 20 U.S.C. § 6301(1), (4), (6).  Accordingly, under 20 U.S.C. § 6311, accountability requirements for participating public schools were mandated. The State had to show that it has "developed and is implementing a *single, statewide State accountability system* that will be effective in ensuring that all local educational agencies, public elementary schools, and public secondary schools make adequate yearly progress as defined under this paragraph."

10.  The accountability system required that "sanctions and rewards, such as bonuses and recognition, [be used by] the State . . . to hold local educational agencies and public elementary schools and secondary schools accountable for student achievement and for ensuring that they make adequate yearly progress in accordance with the State's definition . . . ." 20 U.S.C. § 6311(b)(2)(A).

11.  Among other things, each State receiving federal grants was required to have an approved plan for determining students' adequate yearly progress ("AYP"). AYP must be "defined by the State in a manner that (i) applies the same high standards of academic achievement to all public elementary school and secondary school students in the State; and (ii) is <u>statistically valid and reliable</u> . . . ." § 6311(b)(2)(C) (emphasis added).

---

[1] According to the United States Department of Education's webpage on accountability, "[s]chools that do not make progress must provide supplemental services, such as free tutoring or after-school assistance; take corrective actions; and, if still not making adequate yearly progress after five years, make dramatic changes to the way the school is run." *Cf. U.S. Department of Education Takes Enforcement Against Two School Ownership Groups* (U.S. Dept. Of Education, Press Release, Feb. 1, 2016).

12. The Act further required each State plan to contain <u>assurances</u> that the State educational agency met the requirements of subsection (h)(1) of § 6311. Penalties were authorized by the Secretary, and other assurances and reviews were mandated. However, accuracy of the State's assurances, representations, and certifications as to whether the federal grants were being spent and implemented properly depended on the data supplied by the Districts' teachers, administrators, and superintendents. Similarly, whether these persons were entitled to bonuses, awards, or even to retain their jobs with money paid by federal grants depended on the accuracy and truthfulness of the grades, attendance, and other criteria by which their schools were evaluated.

13. False and misleading reporting of students' grades and attendance runs directly contrary to federal accountability requirements. False and misleading reports of students' grades and attendance violates clear federal policy as set forth in several statutes, including, inter alia, 20 U.S.C. § 6301(1), (12) (2000), federal regulations, executive orders by the President, and statements by the Secretary of Education.

**Parties and the Major Actors Involved**

14. The Plaintiff is an individual, citizen, and resident of Charleston County, State of South Carolina, employed as a teacher. She was a contract teacher in the Charleston County School District at North Charleston High School in the 2013-2014 year. North Charleston High School is a public school operated by and within the Defendant District in Charleston County, South Carolina.

15. The District is a governmental entity and a division of the State of South Carolina, located in Charleston County.

16. Robert Grimm was and is at all times relevant the Principal of North Charleston High School, an employee and administrator for the Defendant District, and the direct supervisor of the Plaintiff Valerie Paquette. By virtue of his position as Principal of North Charleston High School, Grimm was responsible for managing his employees, and setting policies for his school and teachers to achieve specific, verifiable

improvements as set forth in his employment contract and job description and, more generally, to also stop his at-risk school from persistently failing in its duties to educate its students. He had been hired specifically for these purposes.

17. Grimm was at all times responsible for complying with all federal laws regarding grants of money received by and used by North Charleston High School, as well as the accuracy of its educational and attendance records.

18. James Winbush was at all times relevant an employee, administrator, and Associate Superintendent of the District, and also the supervisor of Principal Robert Grimm and Valerie Paquette. As with Principal Grimm, Mr. Winbush's job duties included responsibility for motivating his employees and setting forth and approving policies for the schools and teachers under his supervision; to implement and achieve specific, verifiable improvements in education set forth in his employment contract and job description; and also to improve the at-risk schools under his supervision so that their persistent failures to educate and graduate students would end.

19. Winbush was responsible for ensuring compliance with all laws regarding federal educational grants of money received, spent, and used by North Charleston High School and other District schools over which he acted as Associate Superintendent, responsibility for ensuring compliance with all federal laws regarding grants of money received by and used by North Charleston High School, as well as the accuracy of its educational and attendance records.

20. At all times relevant hereto, Nancy McGinley was a District employee, Superintendent, and the Chief Operating Officer of the Defendant District. In this capacity, she was the supervisor of James Winbush, Robert Grimm, of the Plaintiff, and all other employees in the District. By virtue of her position as Chief Operating Officer and School Superintendent of Charleston County Schools, McGinley set and implemented official policies designed to end the failures of the at-risk schools and to have them reach acceptable educational standards. Furthermore, McGinley was at all times responsible for ensuring that all

federal laws regarding expenditures of federal educational grants of money received and spent by the District be complied with.

**V.    PRESSURE ON SCHOOL ADMINISTRATORS IN THE DISTRICT TO REMEDY PERSISTENTLY FAILING SCHOOLS**

21.  In July of 2012, North Charleston High School was one of only seven high schools in the entire State of South Carolina rated as a "persistently failing" school by the South Carolina Department of Education. This school had been declared an "at risk" school for at least eight consecutive years, with North Charleston High School having an "on time Graduation Rate of 43.5%" and an "End of Course Pass Rate of 37.8%."

22.  On Sunday, July 8, 2012, Nancy J. McGinley, was quoted in the *Charleston Post and Courier Newspaper* as saying, "[t]he District has cut in half its at risk schools since 2007, and that kind of success can happen for Burke High School and North Charleston High.  My prediction is we're going to see greater progress."

23.  On August 9, 2012, the District entered a "Professional Employment Agreement" (the "Agreement") hiring Robert Grimm to be the Principal of North Charleston High School. The Agreement included a specific provision that the District would pay a goals-based bonus if Grimm achieved results in five categories. These categories included the categories of (A) "EOC – Percentage passing End of Course Tests," which is the percent of passing scores (70 or higher) on all End of Course Tests administered at North Charleston High School, and (B) "Grad – On-time Graduation Rate," which is the percentage of students enrolled on the 45th day of school as a first-time ninth grader who earns a standard high school diploma within four years." Principal Grimm's Agreement also provided that each year he would earn 20% of the total bonus of each of the five categories, in which the goal is achieved, including $15,000.00 for the school year 2013-2014. The bonuses were to be paid out once the District had sufficient data to measure the results. Upon information and belief, federal funds were used directly or indirectly to fund the bonuses.

24.  The "EOC – Percentage Passing End of Course Tests" and "Grad – On Time Graduation Rate" at all times relevant hereto

were and are also used to calculate the "Absolute Rating" for all public high schools on the South Carolina School Report Cards published annually by the South Carolina Department of Education, which had labeled North Charleston High School as an "at risk" school.

**VI. GRADE AND ATTENDANCE MANIPULATION BY THE DISTRICT**

25. Upon information and belief, during the academic school year 2013-2014, and at all times relevant hereto, the District and Robert Grimm, in his capacity as Principal of North Charleston High School; James Winbush, in his capacity as the direct supervisor of Robert Grimm; and Nancy McGinley, as Superintendent and CEO of the Defendant District and the direct supervisor of James Winbush, maintained policies at North Charleston High School that did not allow any teacher to give a student a grade below 61, no matter how little work a student did, no matter how poorly a student performed in his or her course work, and no matter how little effort a student made. Other schools in the District also followed similar measures.

26. This was done by McGinley, Winbush, Grimm, and the District in violation of federal accountability requirements.

27. Upon information and belief, during the academic school year 2013-2014 at North Charleston High School, another policy, this one dealing with absences from school, was being implemented by Robert Grimm as Principal and permitted by James Winbush as Robert Grimm's supervisor and Nancy McGinley as Superintendent of the Defendant District. This policy permitted students to earn a high school diploma and graduate, even if they had more than ten absences from school, by enabling virtually any kind of absence to be an "Excused Absence" even when the absence did not entitle the student to have an "Excused Absence," as well as to maintain a Policy of overlooking it when a student had more than ten absences for any reason from an academic course. Other schools in the District were allowed to follow similar measures.

28. This was done by McGinley, Winbush, Grimm, and the District in violation of federal accountability requirements.

29. The policies were disseminated from these and other administrators by way of written instructions and oral instructions that still continue.

30. Another means of grade manipulation involved a computer program called Edgenuity. Upon information and belief, by maintaining the policies as set forth above, the Defendant District enabled Grimm to be able to manipulate the graduation rate of students at North Charleston High School in June of 2014, because if a student failed to receive a passing grade on his or her regular class work, the student could enroll in a program after Thursday, May 29, 2014 at 4:00 pm, when final grades were to be due and posted, including an Edgenuity course, which is an on-line course administered by school employees. Despite the student previously having done little or no work, made little or no effort, and having scored below 61 in total actual grades earned on tests, quizzes, and projects, he might still pass the course via the Edgenuity program and other measures such as the District ignoring the mandatory requirements to attend a certain number of classes. This in turn allowed students to graduate from high school when they had not passed the required courses or attended school the required number of days.

31. Upon information and belief, as a direct and proximate result of these grade and attendance manipulations, one or more students who still had failing grades and not had met the attendance requirements by the school's reporting deadline of Thursday, May 29, 2014 at 4:00 pm. in English Four, and in Integrated Business Applications had their grades changed to passing by Wednesday, June 4, 2014 in time to be able to graduate.

32. It is against the public policy of the State of South Carolina and is a matter of public concern for a teacher to return a final exam after the end of an exam period so that the student could complete additional questions that had been left blank and resulting in a final grade being increased for that student after the grading deadline.

33. In addition to being pressured herself, the Plaintiff has seen other teachers pressured by Grimm to change grades or take other measures to allow failing students to graduate. The

policies, practices, and rules requiring teachers to give grades of at least 61 to students who had lower grades, and the other "remedial" measures such as the on-line courses designed to pass students who had not attended class, were made known to teachers in the Plaintiff's school. The requirement to raise any grade below 61 up to a grade of 61 was set forth in the Teacher's Manual. The District's requirement of artificially raising grades continues even today.

**VII. PAQUETTE'S ATTEMPTS TO REPORT THE WRONGDOING**

34. An incident occurred between the Plaintiff and Principal Grimm at the end of the 2013-14 school year. Grimm pressured the Plaintiff to assist him in graduating a student who was not entitled to graduate. She refused to do so and was greatly shaken by the encounter.

35. Following the incident, the Plaintiff notified Nancy McGinley on June 3, 2014 in McGinley's capacity as Superintendent of the District, by way of an email from the Plaintiff's home computer and sent on a day on which she was not teaching or on school grounds, of her grave concerns that on June 4, 2014, the graduation date for North Charleston High School, at least one student was given his final exam back so that he could complete additional questions that had been left blank during the test and that this additional work resulted in a grade being changed to passing after the deadline; that at least one student who failed the year was allowed to enroll in a computer class and pass a year-long class/course based on alleged online work which allegedly took place entirely during the weekend before graduation; and that a student who failed her class was at graduation practice.

36. On Wednesday, June 4, 2014, the Plaintiff notified the members of the Charleston County School Board of Trustees that she had evidence of students graduating North Charleston High School who did not fulfill the aforementioned grade and attendance requirements to graduate.

37. The purpose of the Plaintiff's emails was to resist what she perceived was improper pressure to graduate a student who did not deserve to graduate and to expose other improper practices by the District's administrators of raising grades and

manipulating attendance records of students who were not entitled to graduate and thereby receiving personal gain in the form of bonuses and job security. A truthful and accurate copy of her emails to the District CEO McGinley and the Board of Trustees is attached as Exhibit A.

38. On June 4, 2014, as a direct and proximate result of her incident with Principal Grimm, the Plaintiff received a written Formal Reprimand from him dated June 2, 2014, alleging violations of Charleston County School District Policy GBE Employee Rights and Responsibilities. See Exhibit B.

39. Grimm falsely accused the Plaintiff of creating a tense situation, lying to him, not following his directives, and presenting herself in an inappropriate and unprofessional light. Grimm further expressed displeasure at the Plaintiff for speaking to a fellow employee about pressure put on the Plaintiff by Grimm to help graduate a student without proper credentials to graduate, even though this type speech is permitted by the school policy attached to his Formal Letter of Reprimand.

40. Grimm further wrote in his Formal Reprimand that another infraction "will" result in further consequences, up to and including suspension or dismissal. Grimm sent copies of his June 2, 2014 Formal Reprimand to the District's Department of Employee Relations and put a copy in her personnel file.

41. If Grimm's Formal Letter of Reprimand were not enough, on August 4, 2014, as a direct and proximate result of her reporting the District's misconduct, the Plaintiff received a second Formal Written Reprimand from Nancy McGinley in her capacity as Superintendent of the District dated July 23, 2014, excoriating the Plaintiff for her whistleblowing actions.

42. Among McGinley's allegations were that the Plaintiff was insubordinate, and that after a thorough investigation, the Plaintiff's claims of misconduct were unsubstantiated. McGinley's reprimand further accused the Plaintiff of making false statements in a letter to the Board of Trustees, violating the Policy of Employee Conduct, irresponsibility, and actions inconsistent with school policy. Moreover, McGinley alleged that had the matter occurred while her teaching contract was in force

(McGinley's letter was written during the summer), she "would" have been immediately suspended or fired. McGinley ended the reprimand by threatening that "[y]ou are on notice, effective today, that a future incident <u>will</u> result in further disciplinary action, up to and including suspension or dismissal." <u>See</u> <u>Exhibit C</u>, Nancy McGinley's Formal Letter of Reprimand at 2 (July 23, 2014) (emphasis added).

    43. McGinley further claimed that the Plaintiff violated Charleston County School District Policy GBE Employee Rights and Responsibilities by failing to "follow the chain of command to resolve personnel and operational issues" rather than contacting the Charleston County School Board. However, Policy GBE Employee Rights and Responsibilities specifically sets forth a broad contractual privilege for teachers in this regard, namely "No employee of [sic] Charleston County School District may be <u>penalized, harassed or disciplined</u> <u>in any way</u> for having filed charges, testified, <u>assisted or participated in any manner in any investigation</u>, proceeding or lawsuit; [sic] <u>or having communicated in any way</u> with any <u>public official</u> or member of the press or <u>member of the public</u>." CCSD Policy GBE Employee Rights and Responsibilities at 1 (emphasis added).

    44. No actions have been taken against McGinley, Winbush, or Grimm for harassment, penalization, and constructive demotion of the Plaintiff.

    45. McGinley's Formal Letter of Reprimand was put in the Plaintiff's personnel file, where it may be reviewed by any person seeking to hire her at a job in the Charleston County School District where the Plaintiff lives with her family.

    46. Additionally, copies of McGinley's reprimand were sent to Associate Superintendent James Winbush, Robert Grimm, the Department of Employee Relations, and also placed in her employment file.

    47. Despite the two Formal Reprimands placed in her file, on August 4, 2014, the Plaintiff received a third written Formal Reprimand from James E. Winbush, in his capacity as Associate Superintendent of the Defendant District, wrongfully, falsely and libelously accusing the Plaintiff of wrongdoing. <u>See</u> <u>Exhibit D</u>.

48. Specifically, Winbush accused the Plaintiff of insubordination and a pattern of "doing what you want to do" despite directives from Grimm, and put her on notice that a future incident could subject her to further discipline, up to and including suspension or termination.

49. Other than a brief mention of a transfer, the third Formal Reprimand stated essentially the same complaints as the first two Formal Reprimands and thus reinforced the District's disdain for the Plaintiff.

50. Winbush's Formal Reprimand was sent to Associate Superintendent Paul Padron, Robert Grimm, Joseph Williams (who was principal of the middle school where she was being transferred), and her employee personnel file. Attached to the Formal Reprimand was a copy of Policy GBE Employees' Rights and Responsibilities.

51. The Plaintiff has never been informed that her Formal Letters of Reprimand were removed, and she believes that they are still in her file continuing to cause injury to her reputation and available to principals and other administrators within the District.

52. Upon information and belief, the standard practice for hiring teachers within the District is for the principal or other hiring administrator at the school where a teacher is applying for work to solicit information from the principal at the school where the teacher is currently employed. The teacher's personnel file is examined by the hiring principal also. The teacher may be interviewed at some point in the process.

53. Since the three Formal Letters of Reprimand have been put in the Plaintiff's file, she has applied for numerous jobs. Each attempt at employment follows a similar pattern: the Plaintiff gets a good initial reaction from the principal/hiring administrator. Thereafter, she later delivers a thank-you note at the school. However, the Plaintiff typically gets no further communications from the school in response to her calls, emails, and notes, even from principals and hiring administrators she has known and with whom she has enjoyed cordial relations over the years.

54. This same pattern has emerged with interviews at almost every other school at which she applied.

55. Since the three formal reprimands were put into her file, the Plaintiff applied for work at numerous schools in the area where she resides (Awendaw, South Carolina) including Jennie Moore Elementary School, Sullivan's Island Elementary School, East Cooper Montessori School, James Simons Elementary School, Moultrie Middle School, Wando High School, Belle Hall Elementary School, James Simons Montessori School, Stono Park Elementary, Murray-Lasaine Elementary School, and the School of the Arts. None of the schools would hire her.

56. The Plaintiff has experience in how the Charleston County School District and its hiring practices operate. Based on her knowledge, experience, and the facts at hand, she believes that as a direct and proximate result of the Defendant's actions, she has been greatly impaired in her career. While she is still employed as a teacher in the district, with the same pay given to teachers with her years of experience, she has been denied the ability to move to other schools, including those with a better school environment, where she would like to teach.

57. Although her teaching certificate entitles her to teach in any elementary, middle, and high school in the county, principals who are interested after her hiring interview become disinterested when they check her employment file.

58. As a practical matter, the Plaintiff is greatly restricted in obtaining employment opportunities at other schools of her choosing. The Plaintiff is no longer at the same status as all other teachers in the district with her same level of experience. She is being denied the options offered to all other teachers of good standing in the District and believes she is trapped in her current position until she retires. The Plaintiff has focused her job search in the East Cooper area because it is much closer to her home. Employment there would allow more time at home with her family, which is very important to her. Such a move would benefit her both financially and from a quality of life standpoint, but no school to which she has applied in the East Cooper area will accept her.

59. The Plaintiff has invested thousands of dollars to expand her teaching certificate to include elementary education. She also might wish to pursue an administrative certificate in the future; however, she currently is being hampered in her ability to pursue an administrative position with three Formal Reprimands in her file.

60. The Letters of Reprimand which the Plaintiff received from Robert Grimm, the Principal of North Charleston High School and James Winbush, the Associate Superintendent of the District, as above stated, each misrepresented the truth by stating that the Plaintiff was "unprofessional."

61. On July 23, 2014, Nancy J. McGinley wrote a letter falsely accusing the Plaintiff of "insubordination" and of making false statements, and that this letter of July 23, 2014 was published to others and made part of the permanent personnel file of the Plaintiff within the District, which has damaged the reputation of the Plaintiff for fitness in her profession, and has kept the Plaintiff from professional advancement.

62. The above stated false and libelous written statements were made with malice in retaliation for the Plaintiff bringing forth concerns she had in good faith about wrongdoing done by and on behalf of the administrative personnel of the Defendant District, and the District failed to adequately address matters of public concern that the District wanted to suppress by intimidating the Plaintiff and others from exposing the misuse of substantial public funds and resources.

63. The publication of the false statements as above stated have directly and proximately injured the Plaintiff's reputation for fitness in her profession.

64. The placing of the Formal Reprimands in the Plaintiff's personnel file by her direct supervisors, Robert Grimm, James Winbush, and Nancy McGinley, constructively demoted and changed the employment status of the Plaintiff because, before the placement of such Formal Reprimands in her personnel file, the Plaintiff was eligible by her teaching certifications for transfers or changes in her employment opportunities or place of employment, but that she no longer has the ability after

placement of such Formal Reprimands in her personnel file.

65. The Plaintiff is no longer in the same employment position now as she was prior to the reprimands in her personnel file.

## VIOLATION OF 31 U.S.C. § 3729
## FALSE CLAIMS ACT

66. Relator Valerie Paquette re-alleges and incorporates by reference each of the allegations in the preceding paragraphs as though fully set forth below.

67. The Defendant has knowingly and willfully, in violation of the False Claims Act:

(a) presented, or caused to be presented, false or fraudulent claims for payment to or approval by the United States in the form of educational records showing students' attendance and academic progress inflated far above their true levels;

(b) made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim; and stated false claims to the United States Government in order to receive federal funds in the form of educational grants and other money, which directly and proximately resulted in substantial money and benefits to the District and its employees to which there were not entitled.

## VIOLATION OF 31 U.S.C. § 3730(h)
## FOR RETALIATING AGAINST PLAINTIFF-RELATOR

68. Valerie Paquette re-alleges and incorporates by reference each of the allegations in the preceding paragraphs as though fully set forth below.

69. The Plaintiff's aforementioned injuries and damages were directly and proximately caused by the retaliatory actions taken by the District and are in direct violation of 31 U.S.C. § 3730(h), which provides that "[a]ny employee, contractor, or agent shall be entitled to all relief necessary to make that employee . . . whole, if that employee . . . is discharged,

demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee . . . in furtherance of an action under this section or other efforts to stop one or more violations of this subchapter."

### **PRAYER**

**WHEREFORE**, Plaintiff-Relator on behalf of herself and the United States, pursuant to 31 U.S.C. § 3730 prays:

(1) That Defendant cease and desist from violating the federal False Claims Act, 31 U.S.C. § 3729 <u>et seq.</u> by its unlawful purposes against the United States and the Plaintiff Paquette.

(2) That this Court enter judgment against Defendant:

i. Awarding an amount equal to three times the damages that the United States has sustained because of Defendant's conduct, plus prejudgment interest and civil penalties of at least $5,000 to $10,000, with penalties adjusted upwardly as specified by applicable law, for each act in violation of 31 U.S.C. § 3729(a)(1);

i. Awarding Plaintiff-Relator the appropriate bounty as supported by 31 U.S.C. § 3730; and

ii. Awarding Plaintiff-Relator attorneys' fees and costs of this action, with interest, including the costs to the United States for its expenses.

(3) That Defendants disgorge all sums by which they have been unjustly enriched by their wrongful conduct;

(4) That Plaintiff-Relator receive special damages, costs, and attorneys' fees, pursuant to 31 U.S.C. § 3730(h);

(5) That the United States and Plaintiff-Relator receive all relief, both at law and at equity, to which they may reasonably be entitled; and

(6) That the Court order such further relief as it

deems just and proper.

SIGNATURE ON NEXT PAGE

          Kobrovsky Law Offices

          s/Lawrence Kobrovsky
          Lawrence C. Kobrovsky, Esq.
          Fed. Bar# 5294
          123 Meeting Street
          Charleston, SC 29401
          PH 843-853-3703
          kobrovskyl@bellsouth.net


          E. Warren Moise
          E. WARREN MOÏSE/Fed. ID # 4879
          473 SAVANNAH HIGHWAY
          CHARLESTON, SC  29407
          (843) 722-0311
          (843) 722-1374 fax
          warren.moise@gmail.com

          ATTORNEYS FOR RELATOR-PLAINTIFF

Date:  May 3, 2016

Charleston, South Carolina